**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER J. HADNAGY, individually and on behalf of SOCIAL-ENGINEER, LLC, | : : : : | CIVIL ACTION – LAW |
| Plaintiff, | : : | |
| vs. | : : | JURY TRIAL DEMANDED |
| JEFF MOSS, | : : | |
| and | : : | NO.: 2:22-cv-03060-WB |
| DEF CON COMMUNICATIONS, INC., | : : : | |
| Defendants. | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

AND NOW, comes Plaintiffs, Christopher J. Hadnagy, individually and on behalf of

Social-Engineer, LLC, by and through their counsel, Comitz Law Firm, LLC, and hereby submit

their Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal

Jurisdiction and Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(2) and (6), as follows:

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Table of Citations | | iii |
| I. | Introduction | 1 |
| II. | Factual Background | 2 |
| III. | Standard of Review | 7 |
| IV. | Legal Arguments | 8 |
| | A. Plaintiffs have established by a preponderance of the evidence that the exercise of personal jurisdiction by this Honorable Court over Defendants in the instant action is proper | 8 |
| | B. None of Plaintiffs' claims fail as a matter of law, and on the contrary, Plaintiffs' claims are sufficiently pled in the Complaint. | 14 |
| | 1.) The alter ego claims against Defendant Moss. | 15 |
| | 2.) The defamation and false light claims. | 17 |
| | 3.) The tortious interference claims. | 20 |
| | 4.) The intentional infliction of emotional distress (IIED) claim. | 22 |
| V. | Conclusion | 24 |

i

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

*Adler, Barish, Daniels, Levin and Creskoff v.`Epstein*,
393 A.2d 1175 (Pa.1978) ........................................................................... 20-21

*Armstrong v. Paoli Memorial Hosp.*,
633 A.2d 605 (Pa. Super. 1993) ............................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2008) ................................................................................ 7, 14

*Bell Atlantic Corp. v. Twombley*,
550 U.S. 544 (2007) ................................................................................ 7, 14

*Birl v. Philadelphia Elec. Co.*,
167 A.2d 472 (Pa. 1960) ........................................................................... 17

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ............................................................................. 8-9, 10

*Calder v. Jones*,
465 U.S. 783 (1984) ................................................................................. 12

*Carlson v. Colorado Firearms, Ammunition and Accessories, LLC*,
No. CV 22-1686, 2022 WL 11398472 (E.D. Pa. Oct. 19, 2022) ............................ 8, 9

*Carteret Sav. Bank, F.A. v. Shushan*,
954 F.2d 141 (3d Cir. 1992) ..................................................................... 7

*College Watercolor Group, Inc. v. William H. Newbauer, Inc.*,
468 Pa. 103 (1976) .................................................................................. 15

*Crivelli v. Gen. Motors Corp.*,
*215 F.3d 386, 394 (3d Cir.2000)* ............................................................. 20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ................................................................................ 9

*Devon MD, LLC v. Demaio*,
2019 WL 7042426 (E.D. Pa., Dec. 19, 2019) ............................................. 12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ................................................................................ 9

*Gray v. Huntsinger,*
147 A.3d 924, 927 (Pa. Super. 2016) ........................................................ 22

*Green v. Mizner,*
692 A.2d 169 (Pa. Super. 1997) ..............................................................20

*Helicopteros Nacionales de Colombia S.A. v. Hall,*
466 U.S. 408 (1984) ................................................................................9

*Hoy v. Angelone,*
720 A.2d 745, 753-754 (Pa. 1998) ..........................................................22

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945) ....................................................................... 8, 9-10

*Kazatsky v. King David Memorial Park, Inc.,*
527 A.2d 988, 991 (Pa. 1987) ................................................................22

*Kendall v. Daily News Pub. Co.,*
716 F.3d 82 (3d Cir. 2013) ....................................................................17

*Kerrigan v. Otsuka Am. Pharm., Inc.,*
560 F. App'x 162, 168 (3d Cir. 2014) .................................................... 17

*Larsen v. Philadelphia Newspapers, Inc.,*
543 A.2d 1181 (Pa. Super. 1988) .......................................................... 17

*Love v. Cramer,*
606 A.2d 1175 (Pa. Super. 1992) .......................................................... 23

*Lumax Indus., Inc. v. Aultman,*
669 A.2d 893 (Pa. 1995) ........................................................................15

*Maier v. Maretti,*
671 A.2d 701, 706 (Pa. Super. 1995) ......................................................19

*Malone v. Weiss,*
No. CV 17-1694, 2018 WL 827433 (E.D. Pa. Feb. 12, 2018) ....................16

*Marten v. Godwin,*
499 F.3d 290 (3d Cir. 2007) ..................................................................12

*Miketic v. Baron,*
675 A.2d 324 (Pa. Super. 1996) ............................................................19

*Miller Yacht Sales, Inc. v. Smith,*
384 F.3d 93 (3d Cir.2004) .............................................................................7

*Moore v. Cobb-Nettleton,*
889 A.2d 1262 (Pa. Super. 2005) ...............................................................17

*O'Connor v. Sandy Lane Hotel Co.,*
496 F.3d 312 (3d Cir. 2007) ...................................................................8, 10

*Pelagatti v. Cohen,*
536 A.2d 1337 (Pa. Super.1987) ................................................................ 17

*Phillips v. County of Allegheny,*
515 F.3d 224 (3d Cir. 2008) .................................................................... 7-8

*Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas,*
675 F.2d 587 (3d Cir. 1982)..........................................................................9

*Remick v. Manfredy,*
238 F.3d 248 (3d Cir. 2001) ...................................................................... 13

*Ruder v. Pequea Valley School Dist.,*
790 F. Supp 377 (E.D. Pa. 2011) ............................................................. 7-8

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,*
898 F.2d 914 (3d Cir. 1990) .......................................................................17

*Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,*
75 F.3d 147 (3d Cir. 1996) ...........................................................................9

*Walden v. Fiore,*
571 U.S. 277 (2014) .......................................................................................8

*Warren General Hospital v. Amgen, Inc.,*
643 F.3d 77 (3d Cir. 2011) ........................................................................ 14

## STATUTES

42 Pa. Cons.Stat. Ann. § 5322(b) ..................................................................................8

42 Pa. Cons. Stat. § 5535 ...........................................................................................13

42 Pa. Cons.Stat. § 8343 ............................................................................................17

## RULES

Fed. R. Civ. P. 4(e) .....................................................................................................8

Fed. R. Civ. P. 8(a)(2)-(3) ..........................................................................................7

Fed R. Civ. P. 12(b)(2)................................................................................................7

Fed R. Civ. P. 12(b)(6)................................................................................................7

Fed.R.Civ.P. 15(a)(2) ................................................................................................16

## I.      **INTRODUCTION**

The present Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(2) and (6) filed by Defendants, Jeff Moss and DEF CON Communications, Inc., must be denied in its entirety, as Plaintiffs, Christopher J. Hadnagy, (hereinafter referred to as "Plaintiff Hadnagy"), and Social-Engineer, LLC, (hereinafter referred to as "Plaintiff Social-Engineer"), have not only established this Court's personal jurisdiction over Defendants, but also alleged sufficient facts in support of their causes of action against Defendants in their Complaint.

Despite Defendants' reference to "a dizzying array intentional tort claims," the facts are quite simple: Defendants intentionally defamed Plaintiffs, which in turn, caused Plaintiffs to suffer severe and irreversible harm to their reputations, and caused Plaintiff Hadnagy to suffer emotional distress. For the reasons more fully set forth herein by Plaintiffs, Defendants' Motion to Dismiss must be denied, as it is merely a tactic to discredit Plaintiffs' action and to facilitate Defendants' evasion of liability.

Plaintiff Hadnagy has been accused of "loudly trumpeting his status as a victim of 'cancel culture'." And why shouldn't he? He and his company have been publicly ostracized and berated based on false allegations made by Defendants in a lackluster attempt to justify their imposition of a lifelong ban of Plaintiffs from the Defendants' annual hacker conference in Las Vegas, Nevada, (hereinafter referred to as "the Event"). The Event is one that Plaintiffs contributed to significantly through the years – each year from 2010 to 2021. However, this litigation is not Plaintiffs' retaliation for being banned from attending and/or participating at the Event. This litigation is the direct result of the insurmountable harm that Defendants' February 9, 2022 defamatory statement caused to Plaintiffs.

If Plaintiff Hadnagy is guilty of "loudly trumpeting" anything, it is his innocence with respect to any and all allegations giving rise to the defamatory statements in question. Plaintiff Hadnagy has consistently denied any harassment on his part, and has attempted, time and again, to explain to Defendant Moss his suspicion that any accusations against him were likely due to the termination of a former, now vengeful, employee who tried to compete with Plaintiffs in violation of that employees' employment agreement, and now seeks to ruin Plaintiffs' reputation in the community.

But Defendants did not care about the truth, nor did they attempt to investigate the allegations in question. Instead, Defendants became willing participants in a scheme to damage Plaintiffs' reputations and prevent Plaintiffs from expanding their social engineering conference and/or take Plaintiffs' SEVillage to a different conference, as demonstrated by Plaintiffs' unmerited and unjust ban from the Event and Defendants' public defamation of Plaintiff Hadnagy for behavior he refutes to date.

## II.    FACTUAL BACKGROUND

Defendant, Jeff Moss, (hereinafter referred to as "Defendant Moss"), who also refers to himself and is referred to as "The Dark Tangent" throughout the technology community and/or industry, is the founder of Defendant DEF CON Communications, Inc., (hereinafter referred to as "Defendant DEF CON"), and is registered as the corporation's governor, and **single-handedly recruits and maintains relationships with contributors for the Event**.

DEF CON Communications, Inc., is organized for the purpose of conducting an annual hacker conference in Las Vegas, Nevada, one of the world's largest hacker conventions, and typically hosts professionals to speak about IT-related as well as a multitude of "villages" and/or workshops, i.e. break-out sessions that invite smaller groups of attendees to participate in cyber-

security challenges and/or demonstrations related to different topics. The Event oftentimes allows attendees to participate in hacking-related "games", i.e. Capture the Flag (CTF).

The initial Event took place in 1993 and was essentially a party for Defendant Moss's hacker friends, with approximately one hundred (100) participants. After the initial Event, Defendant Moss decided to hold the event annually, and attendance has grown each year since. The Event is highly-regarded in the tech industry, and its legitimacy has grown exponentially since its inception in 1993.

In or around 2015, Defendant Moss, and attributed to "The Dark Tangent," by and through Defendant DEF CON, put forth a vague and ambiguous Code of Conduct applicable to attendees and/or participants. The original Code of Conduct repeatedly addressed Defendant DEF CON's purported zero tolerance policy for "harassment." According to the Code of Conduct, "we do not condone harassment against any participant, for any reason. Harassment includes deliberate intimidation and targeting individuals in a manner that makes them feel uncomfortable, unwelcome, or afraid."

Prior to February of 2022, Plaintiff Hadnagy was an esteemed participant in the Event, hosting one of the most attended "villages" at the Event, (hereinafter referred to as "the SEVillage"). Plaintiffs first contributed to the Event years ago, and **with the encouragement and support of Defendant Moss**, Plaintiff Hadnagy invested time and money to develop the SEVillage.

The SEVillage focused primarily on Plaintiffs' area of expertise in the tech industry – human error and the threat it poses to information security. It became extremely popular by and amongst attendees. **Year after year, Defendant Moss sought out and warmly welcomed Plaintiffs' attendance, contributions, and participation at the Event.**

3

In 2020, Plaintiffs began to offer the SEVillage at Plaintiffs' own conference in Orlando, Florida. In January 2022, Plaintiffs advised Defendants that Plaintiffs would not participate in the Event in August of 2022, as the once amicable, close relationship between Defendant Moss and Plaintiff Hadnagy had grown somewhat tense due to messages received from Defendant Moss and other acquaintances associated with the Event.

In response, Defendants ceased communications with Plaintiffs, and, suddenly and without warning, in or around January of 2022, Defendants informed Plaintiff Hadnagy that neither he nor Plaintiff Social-Engineer could attend, contribute to, or participate at the Event moving forward. This ban on Plaintiffs' attendance, contribution, and participation was based on alleged violations of Defendant DEF CON's Code of Conduct, and effectively excluded Plaintiffs from the Event indefinitely.

Plaintiffs **denied and continue to deny any violation(s) of the Code of Conduct at any point in time**. Plaintiff Hadnagy made repeated requests for additional, detailed information regarding the alleged violations; his requests were ignored time and again. Defendants provided no evidentiary support or explanation to Plaintiffs regarding their abrupt termination of Plaintiffs' attendance, contribution, and participation at the Event.

On or about February 9, 2022, even though the 2021 Event that Plaintiffs participated in virtually had occurred months earlier in August of 2021, Defendants Moss and DEF CON subsequently authored and published a Transparency Report, in which stated the following:

> "We received multiple CoC violation reports about a DEF CON Village leader, Chris Hadnagy of the SE Village. After conversations with the reporting parties and Chris, **we are confident the severity of the transgressions merits a ban from DEF CON**."[1]

---

[1]  *https://defcon.org/html/links/dc-transparency.html*

4

Defendants' naming of Plaintiff Hadnagy in the Transparency Report marked the first time that Defendants had named an individual in this manner in a Transparency Report for a violation of the Code of Conduct, and it was therefore foreseeable that participants at the Event, and the IT and InfoSec community at large, would note and response to the Transparency Report. **Defendants' publication of this succinct but scathing Transparency Report created a widespread firestorm of social media commentary, i.e. Twitter retweets and related posts, reacting to the news of Plaintiff Hadnagy's alleged violations of the Code of Conduct. In fact, the vagueness of the Report was particularly troublesome for Plaintiffs.**

Speculation mounted as to what actions were taken by Plaintiff Hadnagy to cause Defendant Moss to abruptly terminate their longstanding business relationship (and friendship), including Plaintiff Hadnagy's invaluable contributions to the Event. **It is apparent that Defendants were fully aware of the magnitude of dissemination of information contained in the Transparency Report due to Defendants' position and status in the IT and InfoSec communities that reasonable minds digesting that Transparency Report on its face would think the absolute worst of Plaintiff Hadnagy, and that was precisely their intention.** Similar lifelong bans, before Plaintiffs' ban, were the result of allegations of a variety of sex abuse and/or sexually predatory behavior on the part of individual (now former) participants. Defendants now attempt to spin the narrative – claiming that they publish Transparency Reports such as the Report in question to encourage other conventions to duplicate this manner of "reporting," thus advancing inclusivity and safety at events such as the Event.

On February 10, 2022, an article entitled "DEF CON bans social engineering expert Chris Hadnagy" was published via TechTarget.com.[2] According to that article, Plaintiff Hadnagy, "an

---

[2]     *https://www.techtarget.com/searchsecurity/news/252513274/DEF-CON-bans-social-engineering-expert-Chris-Hadnagy.*

influential figure at the DEF CON security conference, was permanently banned following allegations of misconduct at the annual Las Vegas gathering." The article goes on to state that Plaintiff Hadnagy was accused of violations, but that no specifics regarding those violations were provided by Defendants.

It is indisputable that the Transparency Report was able to be received and accessed throughout the United States and abroad, thanks to the ability to widely disseminate information via the Internet. **Not only did Defendants' statements damage the reputation of Plaintiff Hadnagy, but they also had a harmful impact on the business dealings of Plaintiff Social-Engineer – business dealings that Defendant Moss was well aware of given his longstanding friendship and business relationship with Plaintiff Hadnagy, and his knowledge of Plaintiff Social-Engineer's business dealings.**

Immediately after the publication of the Transparency Report, actual and potential clients of Plaintiffs began dropping like flies – terminating their relationships with Plaintiffs, specifically citing the allegations made by Defendants as the reason for their respective terminations. For example, Plaintiffs' longstanding client, Northern Trust Corporation, with office(s) located in Philadelphia, Pennsylvania, terminated its contract(s) with Plaintiffs and specifically stated that the cause to be Defendants' statements regarding Plaintiffs in the February 9, 2022 Transparency Report. Northern Trust is one of a plethora of Plaintiffs' clients and/or business relations, speaking engagements, and conferences, which span the globe, that have chosen to part ways with Plaintiffs in light of Defendants' false statements, innuendo, and implications concerning Plaintiffs.

Plaintiff Hadnagy stood in the aftermath of this firestorm, having witnessed the irreversible damage the Transparency Report and Defendants' actions caused to the company he spent his entire adult life developing. He attempted to defend himself from the allegations made against him

by Defendants, steadfastly denying any misconduct and offering insight as to where he believed this false narrative might have originated. It was too late. The damage to his reputation and his company's good will was already done.

As such, Plaintiffs initiated the present civil action via filing of a Complaint on August 3, 2022. Pursuant to an agreement by and between the parties, Defendants filed the present Motion to Dismiss and supportive Memorandum of Law on October 11, 2022. Plaintiffs respond herein.

### III.  <u>STANDARD OF REVIEW</u>

According to Fed.R.Civ.P. 12(b)(2), a party may seek the dismissal, via motion, of a claim and/or claims based on a lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir.2004). If a defendant moves to dismiss a case for lack of personal jurisdiction, the court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

Fed. R. Civ. P. 12(b)(6) allows a party to challenge a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To defeat it, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled relief; and a demand for the relief sought." Fed. R. Civ. P. 8(a)(2)-(3). This means, "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 545 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008) (facial plausibility is necessary, which is an inference higher than possibility but less than probability that the defendant is liable).

However, "[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless such an amendment would be inequitable and futile." *Phillips v.*

7

*County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008); see also *Ruder v. Pequea Valley School Dist.*, 790 F. Supp 377, 390 (E.D. Pa. 2011).

## IV.   **LEGAL ARGUMENT**

### A. *Plaintiffs have established by a preponderance of the evidence that the exercise of personal jurisdiction by this Honorable Court over Defendants in the instant action is proper.*

Pursuant to the Federal Rules of Civil Procedure, personal jurisdiction over a non-resident defendant may be exercised to the extent permitted under state law, i.e the law of the state in which the district court sits. Fed.R.Civ.P. 4(e). Pennsylvania authorizes the exercise of long-arm jurisdiction to the extent permitted under the Due Process Clause. Specifically, Section 5322(b) of the Pennsylvania long-arm statute provides that personal jurisdiction "shall extend to all persons...to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons.Stat. Ann. § 5322(b).

A district court has personal jurisdiction over a non-resident so long as the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Carlson v. Colorado Firearms, Ammunition and Accessories, LLC*, No. CV 22-1686, 2022 WL 11398472, at *2 (E.D. Pa. Oct. 19, 2022) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Although a defendant has the initial burden of raising the defense of lack of personal jurisdiction, once such a defense is raised, the burden shifts to the plaintiff to demonstrate facts that suffice to support an exercise of personal jurisdiction. *Id.* (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)). A plaintiff cannot be the "only link" between the forum state and defendant. *Walden v. Fiore*, 571 U.S. 277, 285 (2014); see also *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish

sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").

There are two types of personal jurisdiction: general and specific. *Carlson,* 2022 WL 11398472 at *2 (<u>citing</u> *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)). General jurisdiction requires the defendant to have maintained "continuous and systematic" contacts with the forum state. *Id.* (<u>citing</u> *Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 588 (3d Cir. 1982)). To determine whether a defendant is subject to general jurisdiction, a court asks whether the defendant is "at home" in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (<u>citing</u> *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

**Plaintiffs have not alleged that this Honorable Court has general jurisdiction over Defendants**, i.e. that Defendants are essentially "at home" in Pennsylvania. **However, Plaintiffs have adequately pled facts sufficient to support the contention that the Court has specific jurisdiction over Defendants and their forum-specific activities.**

For a district court to have specific jurisdiction over a defendant, the defendant's contacts with the forum state must be such that defendant "should reasonably anticipate being haled into court there." *Carlson,* 2022 WL 11398472 at *2 (<u>citing</u> *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In order for a district court to properly exercise personal jurisdiction over a defendant, the plaintiff must satisfy a two-part test. *Id.* The plaintiff must show that the defendant has certain "minimum contacts" with the forum. *Burger King Corp.*, 471 U.S. at 474. Further, the exercise of jurisdiction must be reasonable, in other words, "comport with 'traditional notions of fair play and substantial justice.'" *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 150–51 (3d Cir. 1996) (citing *International*

*Shoe Co. v. Washington*, 326 U.S. 310 (1945)). To satisfy the first prong of the test and show sufficient minimum contacts with the forum state, a plaintiff must show that the defendant "purposefully directed [its] activities" at the forum state. See *Burger King*, 471 U.S. at 472.

In sum, according to the Third Circuit, in order for a defendant to be subjected to personal jurisdiction in a particular forum, the defendant must have purposefully directed their activities toward that forum, the claim(s) must have arisen from the defendant's activities in the forum, and, if the previous conditions are met, exercise of jurisdiction must "comport with 'fair play and substantial justice.'" *O'Connor*, 496 F.3d at 317.

Plaintiffs' Complaint alleges much more than some "unilateral activity" on Plaintiffs' part while simply claiming a relationship with Defendants. The Complaint also alleges much more than Defendants' "out-of-state contact" with a citizen of the forum state. Plaintiffs' factual matter supports the contention that Defendants have sufficient minimum contacts with Pennsylvania for this Honorable Court to exercise personal jurisdiction over them. Defendants have intentionally directed their activities, including the activities directly at issue in this litigation, at Pennsylvania – Plaintiffs' home state, where Plaintiffs maintain business addresses and regularly do business. Plaintiffs also employ Pennsylvania residents, and engage professional services, including accounting and legal services, in Pennsylvania. Defendants' allegedly defamatory statements targeted Plaintiffs' forum-related activities, were published via Internet, and were widely disseminated throughout the Commonwealth.

Plaintiffs' Complaint alleges that this Court has personal jurisdiction over Defendants, as Defendants have certain minimum contacts with the Commonwealth of Pennsylvania, specifically because of Defendants' efforts to solicit attendance at the Event throughout the Commonwealth via the Defendant DEF CON's website. See *Plaintiffs' Complaint* at ¶ 22. Plaintiffs' Complaint

further alleges that, for years, Defendants solicited the attendance and participation of Plaintiffs Hadnagy and Social-Engineer, LLC, a Pennsylvania-based company, at the Event. *Id.* at ¶ 23, 40-43. Not only does the Event welcome the attendance of Pennsylvania residents[3], individuals and business entities alike, but the Event directly solicited Plaintiffs, both Mr. Hadnagy and his company, Social-Engineer, LLC, a Pennsylvania Limited Liability Company with a registered address in the Commonwealth, to attend, contribute to, and participate at the Event for years.

When the totality of the facts alleged in Plaintiffs' Complaint are considered it is apparent that the relationship between Plaintiffs and Defendants goes well beyond that of a typical Pennsylvania attendee of the Event accessing Defendants' website in a bid to gain entry to the Event. **This goes well beyond mere solicitation.** There was a longstanding, mutually beneficial relationship by and between Plaintiffs and Defendants. In fact, it could be argued that the Event's mounting success through the years was the direct result of the popularity of Plaintiffs' SEVillage. On top of that, Defendants regularly solicited attendees for the Event across Pennsylvania, as evidenced by Defendant DEF CON's website.

Furthermore, and critical to note that a number of DEF CON "groups" regularly operate throughout the Commonwealth of Pennsylvania. A group identified as "DEF CON 610" with over 300 members operates in Easton, Pennsylvania, and boasts that it is "**an official DEF CON group**."[4] A group identified as "DC 215" boasts "DC215 is **a DEF CON group** focused on community, education, mentoring and bringing the hacker and InfoSec community in the Philadelphia area together."[5] The group's website even cites Defendant Moss, himself, as follows:

---

[3]     *https://www.businesswire.com/news/home/20220815005484/en/Carnegie-Mellon-Team-Wins-DEF-CON-Hacking-Competition*
[4]     *https://www.meetup.com/defcon610*
[5]     *https://dc215.org/*

"A local DEF CON group (DCG) is part of 'a global community of hackers, thinkers, makers and others bent on being part of the elegant chaos they want to see in the world.'" **Another similar group identified as "DC412" operates in Pittsburgh, Pennsylvania.** Information regarding these groups is publicly accessible, and thus it is assumed that Defendants take no issue with these Pennsylvania groups identifying themselves as official DEF CON group. The creation of such group is publicly endorsed by Defendant Moss. As such, it is only reasonable that Defendants could or should have anticipated to be haled into Court here in Pennsylvania, as they regularly "do business" in Pennsylvania, advance Defendants' identities and business purposes throughout the Commonwealth via official groups and have been personally and professionally coupled with Plaintiffs for years, benefitting exponentially from Plaintiffs' contributions to the Event.

Furthermore, it is Plaintiffs' position that this Honorable Court can exercise jurisdiction over Defendants under the "effects test." *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Under the "effects test," if the Court is asked to consider specific personal jurisdiction over intentional torts, it must "first apply the traditional test [to find minimum contacts] and, if we do not find jurisdiction under the traditional test, we then consider the *Calder* effects test." *Devon MD, LLC v. Demaio*, 2019 WL 7042426, at *8 (E.D. Pa., Dec. 19, 2019) (Kearney, J.).

Under the *Calder* "effects test," this Court may exercise jurisdiction if Plaintiffs show: "(1) Defendants committed an intentional tort; (2) Plaintiffs felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and] (3) Defendants expressly aimed their tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).

Defamation is an intentional tort. Plaintiffs' professional activities are centered in Pennsylvania, and the defamatory Transparency Report called into question Plaintiffs' morals and professional reputation. Plaintiffs have provided specific examples of actual and/or prospective clientele lost in Pennsylvania (specifically the Eastern District) as a result of Defendants' actions. As such, Plaintiffs can successfully contend that they suffered the brunt of the harm here in Pennsylvania.

Furthermore, Plaintiffs can appropriately alleged that Defendants "expressly aimed" their alleged tortious conduct at Pennsylvania. **Specifically, Defendants' alleged tortious conduct appears to have been expressly aimed at injuring the in-forum Plaintiffs in this case.** The Third Circuit has expressly held the same is sufficient to satisfy the *Calder* "effects test." See *Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001).

Thus, Plaintiffs have established by a preponderance of the evidence that the exercise of personal jurisdiction over Defendants in this case is proper, and as such, Defendants' Motion to Dismiss on the basis of the Court's lack of personal jurisdiction must be denied.

In the alternative, because Plaintiffs have made a threshold showing that there is some basis (albeit disputed) for the assertion of personal jurisdiction, this Honorable Court, in its discretion, may allow Plaintiffs leave to conduct discovery limited to the issue of whether personal jurisdiction exists, and Plaintiffs hereby request an opportunity to do so if Defendants' Motion to Dismiss is not outrightly denied by this Court.

Should this Honorable Court dismiss Plaintiffs' claims for lack of personal jurisdiction, it should be done so without prejudice, so that Plaintiffs may refile their claims against Defendants in another forum, in accordance with 42 Pa. Cons. Stat. § 5535.

**B.** ***None of Plaintiffs' claims fail as a matter of law, and on the contrary, Plaintiffs' claims are sufficiently pled in the Complaint.***

As an introductory matter, it is critical to note that Defendants seek the dismissal of Plaintiffs claim based on the merits of those claims, touting a lack of sufficient evidence to make such claims. The present time is not the appropriate time in litigation to argue whether Plaintiffs have adequate evidentiary support for their claims against Defendants. Instead, the focus must be on Plaintiffs' Complaint, and the sufficiency of the contents thereof. Plaintiffs' Complaint is well-pled and sets forth ample material facts to support their various claims. Furthermore, the parties have not had the benefit of discovery in this action, which would allow an exchange of information and/or documentation that will undoubtedly lend support to Plaintiffs' position. Considering the adequate factual matter set forth in Plaintiffs' Complaint, it would be improper for the Court, at this early stage in the pleadings, to conclude that Plaintiffs' claims fail.

Well-settled case law lends support to Plaintiffs' position, and consideration of Plaintiffs' Complaint, as a whole, clearly demonstrates that it meets the requirements established under the Federal Rules of Civil Procedure. "[A] complaint must contain **sufficient factual matter** [...] to 'state a claim for relief that is **plausible** on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (emphasis added) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met where "the plaintiff pleads factual content that allows the court **to draw the reasonable inference that the defendant is liable for the misconduct alleged**." *Id.* (emphasis added) (citing *Twombly*, 550 U.S. at 556). When considering a motion under Fed. R. Civ. P. 12(b)(6), **the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to plaintiff**." *Warren General Hospital v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

**1.) <u>The alter ego claims against Defendant Moss.</u>**

Pennsylvania Courts have set out the following factors to be considered in disregarding the corporate form: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs; and (4) use of the corporate form to perpetrate a fraud. *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (internal citations omitted). See also *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976).

Plaintiffs' Complaint presents factual allegations in support of the contention that Defendant Moss operates as the "alter ego" of Defendant DEF CON. Plaintiffs' Complaint sets forth the way Defendant Moss has allegedly acted as the alter ego of Defendant DEF CON, thus alluding to elements or factors of the veil-piercing test, but also factual contentions in support of those elements. See *Plaintiffs' Complaint*, ECF Doc. No. 1, ¶ 9-18. Specifically, Paragraph 13 is much more than a mere list of the factors of the corporate veil-piercing test. See *Id.* at ¶ 13(a)-(e). Plaintiffs specifically outline those facts that support their claim – that Defendant DEF CON has failed to maintain sufficient corporate records, that it does not hold regular meetings, that Defendant Moss controls the corporation's finances and day-to-day, decision-making, and that the corporation is funded by Defendant Moss' personal assets. Plaintiffs' factual assertions highlight specific action and/or inaction on the part of Defendants. These facts are more than sufficient to state a claim for relief that is plausible.

Additional factual allegations in the Complaint further support Plaintiffs' alter ego claim against Defendant Moss. Per the Complaint, since the inception of the Event, and throughout the years since that inception, Defendant Moss has been and continues to be known as the sole creator and founder of the Event. See *Plaintiffs' Complaint*, ECF Doc. No. 1, ¶ 9, 29, 30. Plaintiffs' Complaint further alleges that Defendant Moss was responsible for the February 9th Transparency

15

Report that defamed Plaintiffs, despite the fact that it was disseminated as a "report" suppled via Defendant DEF CON's website, and not a personal statement issued by Defendant Moss, individually. Id., ¶ 53-55. From this alone, the Court could infer that Defendant Moss is liable for the alleged misconduct both individually and as "alter ego" of Defendant DEF CON."

Furthermore, despite Defendants' argument to the contrary, the Third Circuit **does** permit alter ego allegations based on "information and belief," **just not in instances whereby plaintiffs use merely "boilerplate and conclusory allegations."** *Malone v. Weiss*, No. CV 17-1694, 2018 WL 827433, at *2 (E.D. Pa. February 12, 2018). As argued, *supra*, that is not the case in Plaintiffs' Complaint.

As discovery in this litigation will further demonstrate, for all intents and purposes, Mr. Moss is the alter ego of Defendant DEF CON. In fact, Plaintiffs have identified certain potential witnesses in their initial disclosures whose testimony will no doubt lend credence to Plaintiffs' alter ego claim against Defendant Moss. Plaintiffs are not required, at this stage of the pleadings, to submit evidentiary support for their claims. Instead, Plaintiffs are only required to plead sufficient facts leading to a reasonable inference that Defendants are liable.

As such, Plaintiffs' alter ego claim against Defendant Moss should not be dismissed. In the alternative, should this Honorable Court find that Plaintiffs' factual averments with respect to this claim are inadequate, Plaintiffs' hereby request an opportunity to submit a curative amendment.[6]

---

[6]     *Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading after receiving leave of court, and the court should freely give leave when justice so requires. Fed.R.Civ.P. 15(a)(2).*

**2.) <u>The defamation and false light claims.</u>**

Plaintiffs do not dispute the elements of a claim for defamation as set forth at 42 Pa.C.S. §
8343(a). However, Plaintiffs refute Defendants' contention that they have failed to state a claim
for defamation or invasion of privacy / false light.

A defamation plaintiff must plead, and ultimately prove, a defamatory statement, which is
"one that 'tends so to harm the reputation of another as to lower him in the estimation of the
community or to deter third persons from associating or dealing with him.'" *U.S. Healthcare, Inc.
v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990) (<u>quoting</u> *Birl v. Philadelphia
Elec. Co.*, 167 A.2d 472, 475 (Pa. 1960)). Even where there is a plausible innocent interpretation,
**if there is an alternative defamatory interpretation, the issue must proceed to a Jury to
determine if the defamatory meaning was understood by the recipient.** *Pelagatti v. Cohen*,
370 Pa. Super. 422, 536 A.2d 1337, 1345 (1987), *app. denied*, 548 A.2d 256 (Pa. 1988) (emphasis
added); <u>see also</u> *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013).

"Only statements of fact, not expressions of opinion, can support an action for
defamation." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005). However, an
opinion be understood to imply undisclosed defamatory facts may support a cause of action based
upon those implied facts. <u>See</u> *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001). Whether a
statement is a fact or an opinion is a question of law. *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F.
App'x 162, 168 (3d Cir. 2014).

A claim for invasion of privacy / false light offers redress not merely for the publication of
matters that are provably false, but also for those that, although true, are selectively publicized in
a manner creating a false impression. *Larsen v. Philadelphia Newspapers, Inc.,* 375 Pa. Super. 66,
543 A.2d 1181, 1188-1189 (1988). A false light claim can be established where true information
is released if the information tends to imply falsehoods. *Id.*

17

Plaintiffs have clearly met this pleading requirement in the instant Complaint. Plaintiffs' Complaint discusses, at length, the way Defendants allegedly defamed Plaintiffs, and the extensive harm that defamatory statement caused to Plaintiffs' reputation. See *Plaintiffs' Complaint*, ECF Doc. No. 1, ¶ 48-72, 74-83. Plaintiffs go so far as to specifically identifying specific business dealings that failed as a direct result of Defendants' February 9, 2022 Transparency Report. *Id.*, ¶ 71-72. Plaintiffs' Complaint further alleges facts in support of the innuendo and/or impressions resulting from the Transparency Report. *Id.*, ¶ 55-59. From these factual allegations alone, one could reasonably infer that it was possible and/or probable that the Transparency Report in question tended to harm Plaintiffs' reputation, and created a false impression, thus lowering them in the estimation of the community, and deterring others from associating with them.

Furthermore, the plain language of the Transparency Report in question proves that this statement was not made as a mere opinion of Defendants, but instead, was conveyed as factual in nature. In fact, the Report stated Defendants received "**multiple**" Code of Conduct violation reports, and that they were "**confident the severity of the transgressions merits a (lifelong) ban from DEF CON.**" This is not stated as an opinion, i.e. that Defendants believed Plaintiff Hadnagy might be a danger to others. This is stated as a fact and alludes to an investigation that resulted in a finding of serious transgressions violative of the anti-harassment policy. Plaintiffs deny this entirely. But even if an investigation did take place and Code of Conduct violations were identified, the manner in which those were reported in the Transparency Report created a false impression of Plaintiffs, as the Report was reasonably susceptible to being interpreted as alleging "abhorrent" behavior, due to the fact that **Defendants' naming of Plaintiff Hadnagy in the Transparency Report at issue marked the first time that Defendants had ever named an individual in this manner in a Transparency Report for a violation of the Code of Conduct.**

18

Those who know this Event and its history know that a lifelong ban typically resulted from egregious misconduct. Why? Because, through the years, this Event has notoriously accepted raucous, unique, and, at times, illegal behaviors on the part of attendees and/or participants as demonstrated in various forums associated with the Event and referenced in previous Transparency Reports, for which individuals faced very rare and limited consequences for such behavior. Therefore, those digesting the Transparency Report were left to assume: *If this type of behavior is allowed (and encouraged), then Plaintiffs' behavior must have been terrible.*

Pennsylvania courts recognize a conditional privilege for defamatory statements "made on a proper occasion, from a proper motive, and in a proper manner" whenever "circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." *Maier v. Maretti*, 448 Pa. Super. 276, 671 A.2d 701, 706 (Pa. Super. 1995). A defendant, however, abuses and, thus, waives the privilege when "the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given or to a person not reasonably believed to be necessary to the accomplishment of the purpose of the privilege." *Miketic v. Baron*, 450 Pa. Super. 91, 675 A.2d 324, 329 (Pa. Super. 1996). The defendant carries the burden to prove the privileged character of the occasion on which a defamatory communication was published, and it is the plaintiff's burden to show abuse of a conditionally privileged occasion. 42 Pa. Cons.Stat. § 8343.

Plaintiffs' Complaint does not specifically state that Defendants abused a conditional privilege. However, the Complaint does aver that Defendants had no legitimate interest in publishing the Transparency Report (as Plaintiffs contend that no such violation(s) of any kind ever occurred), and the Complaint further avers that Defendants, specifically Defendant Moss, was

motivated by ill intent or ill will, i.e. to harm Plaintiffs' reputations and replace them at the Event, to prevent Plaintiffs from taking the SEVillage to other conferences, and to negatively impact Plaintiffs' conference in Orlando, Florida. Construing these allegations in the light most favorable to Plaintiffs and accepting those allegations and the inferences drawn therefrom as true, this Court must find that the Complaint sufficiently states that Defendants abused a conditional privilege. See *Green v. Mizner*, 692 A.2d 169, 175 (Pa. Super. 1997) (finding allegations that the appellees published a letter "with malice or recklessness to blacken [the appellant's] reputation" were sufficient to allege abuse of a conditional privilege).

**3.) <u>The tortious interference claims.</u>**

Plaintiffs hereby agree to withdraw Count III, only, as Counts II (Intentional Interference with Contractual Relations) and III (Tortious Interference with Contractual Relations) are duplicative pursuant to Pennsylvania law.

However, Plaintiffs have clearly alleged in their Complaint that Defendants intended to interfere with Plaintiffs' contractual relations, and did so, thus resulting in damages to Plaintiffs. To establish intentional interference with contractual relations, Plaintiff must establish: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir.2000).

In assessing whether a defendant's conduct is proper, "consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the proximity or remoteness of the actor's conduct to the interference, and (f) the relations

20

between the parties." *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1184 (Pa.1978).

Plaintiffs' Complaint adequately pleads factual support for this claim. See *Plaintiffs' Complaint*, ECF Doc. No. 1, ¶ 78, 85-91. Intent is required, and intent is adequately pled by Plaintiffs. *Id.*, ¶ 53-54. Intent is different than motive, which the Court may consider, but which Plaintiffs are not required to plead. Defendant Moss was well aware of certain actual and prospective business relationships of Plaintiffs', given the very nature of Defendant Moss' relationship with Plaintiffs Hadnagy and his company. Plaintiffs do stand firm in the assertion that Defendants' ultimate motive was to replace Plaintiff's SEVillage with another "village," targeted to similar topics but hosted by others. *Id.*, ¶ 53. But Defendants can have more than a single intention or motive. Clearly, as set forth in Plaintiffs' Complaint, Defendant Moss sought to not only replace Plaintiffs at the Event, but also to disparage Plaintiff Hadnagy's reputation, as well as the reputation of his company. Defendants were interested in tarnishing Plaintiffs' reputation. Given the former relationship between the parties to this action and Defendant Moss' wealth of knowledge with respect to Plaintiffs' business dealings and prospects, intentional interference is apparent and flows directly from his intent to defame Plaintiffs.

Plaintiff Hadnagy is presently in possession of a plethora of evidence in support of his contentions, including the intention that Mr. Moss sought to replace him at the conference, and intended to interfere with his actual and/or prospective contractual relations. Plaintiffs are not required to plead every piece of evidence in their possession in support of their claims at this point.

As such, Plaintiffs' claim of intentional interference with contractual relations should not be dismissed. In the alternative, should this Honorable Court find that Plaintiffs' factual averments

with respect to this claim are inadequate, Plaintiffs' hereby request an opportunity to submit a curative amendment.

### 4.) The intentional infliction of emotional distress (IIED) claim.

A plaintiff must establish four (4) elements to state a claim for intentional infliction of emotional distress (IIED): (1) the conduct of the defendant must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) the conduct must cause emotional distress; and (4) the distress must be severe. See *Hoy v. Angelone*, 720 A.2d 745, 753-754 (Pa. 1998). With respect to IIED claims, the Pennsylvania Superior Court has ruled that "the gravamen of the tort of [IIED] is outrageous conduct on the part of the tortfeasor." *Gray v. Huntsinger*, 147 A.3d 924, 927 (Pa. Super. 2016) (citing *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987)).

Specifically, a plaintiff must prove that the defendant "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress." *Kazatsky*, 527 A.2d at 991 (quoting *Restatement (Second) of Torts*, § 46; *Hoy*, 691 A.2d at 482). Existence of the alleged emotional distress must be supported by competent medical evidence. *Id.* at 995. Furthermore, it is apparent that the *Kazatsky* Court used the term "medical" to include such practitioners as psychiatrists, and that the term "injuries" was meant to encompass mental and emotional distress. *Gray*, 147 A.3d at 930, Footnote 4.

Throughout Plaintiffs' Complaint, allegations of severe emotional distress have been asserted. See *Plaintiffs' Complaint*, ECF Doc. No. 1, ¶ 80, 83, 105, 107-110. Furthermore, it has been sufficiently pled that Defendants' conduct was both intentional (or reckless) and outrageous. *Id.*, ¶ 53, 78, 82-83, 86, 91, 100, 102, 107, 108-109.

Defendants discredit Plaintiffs' claim that their actions were extreme and outrageous. Whether or not actions rise to the level of "outrageous" is subjective and within the discretion of the Court. For Plaintiff Hadnagy, it is the coupling of the defamatory statement in question, the

"ripple effect" of its vague nature, and its complete and utter falsity that amounts to legitimate allegations of extreme and outrageous conduct. Alluding, with "confidence" to Plaintiffs' alleged, "severe" misconduct, i.e. harassment of any kind, without conducting an investigation confirming any such behavior, in today's society where "cancel culture" is prevalent, was extreme and outrageous. As such, Plaintiffs have adequately pled the necessary factual material in support of the IIED claim at Count V.

Defendants argue that Plaintiffs' IIED claim must be dismissed because Plaintiff Hadnagy has failed to allege physical harm. It appears as though Defendants have overlooked those Pennsylvania cases that have held that physical harm includes "ongoing mental ... and emotional harm." *Armstrong v. Paoli Memorial Hosp.*, 430 Pa. Super. 36, 45, 633 A.2d 605 (1993). Relying on the Restatement (Second) of Torts § 436A, the Pennsylvania Superior Court has held that symptoms of severe depression, nightmares, stress, and anxiety, which require psychological treatment, sufficiently constitute **physical manifestations** of emotional suffering. *Love v. Cramer*, 414 Pa. Super. 231, 238-239, 606 A.2d 1175 (1992) (emphasis added).

It should be noted that Plaintiff is presently in treatment for the emotional and mental harm, and the physical manifestations of both, that this entire ordeal has caused. Plaintiffs' references to "injuries" as set forth in the Complaint speak to not only the emotional distress he suffers, but also the mental and physical symptomology he has experienced as a result of Defendants' actions. He has felt the effects of the defamatory statement in question since February 9, 2022, and continues to be berated online by those who continue to believe the allegations against him in the Transparency Report at issue. Competent medical evidence of emotional distress can and will be produced in discovery.

23

Lastly, simply because "no other state or federal court in Pennsylvania has done so" does not necessarily mean that the recognition of an IIED claim arising from the alleged defamation in question in the instant action is improper. As such, Plaintiffs' IIED claim should not be dismissed. In the alternative, should this Honorable Court find that Plaintiffs' factual averments with respect to specific allegations of "physical harm" are inadequate, Plaintiffs' hereby request an opportunity to submit a curative amendment.

## V.  **CONCLUSION**

Based on the foregoing, Plaintiffs, Christopher J. Hadnagy, individually and on behalf of Social-Engineer, LLC, respectfully request that this Honorable Court deny Defendants' Motion to Dismiss in its entirety.[7]

Respectfully submitted,

DATE: <u>November 1, 2022</u>        BY:    <u>/s/ Jonathan S. Comitz</u>
JONATHAN S. COMITZ, ESQ.
I.D. NO.:  90914
46 Public Square, Suite 101
Wilkes-Barre, PA 18701
(570) 829-1111
jcomitz@comitzlaw.com

<u>/s/ Ashley A. Zingaretti</u>
ASHLEY A. ZINGARETTI, ESQ.
I.D. NO.:  325167
46 Public Square, Suite 101
Wilkes-Barre, PA 18701
(570) 829-1111
azingaretti@comitzlaw.com

---

[7]    *Plaintiffs' proposed alternative relief (not included here to avoid duplicity) has been suggested throughout, should this Honorable Court rule, in whole or in part, in favor of Defendants.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2022, I caused a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim to be served via CM/ECF filing upon counsel for all parties.

BY: <u>/s/ Jonathan S. Comitz</u>
JONATHAN S. COMITZ, ESQ.
